It is not rational to perpetuate 5,000 years of bigotry, prejudice, and invidious discrimination against homosexual people by using language as a weapon to deny a fundamental constitutional right at issue. African American leaders often speak of 400 years of prejudice to rightly justify race as a suspect classification. 400 years is but a fraction compared to the 5,000 years of invidious discrimination homosexuals have endured and suffered. I don't want to interrupt you so early in your argument, but I don't think the case today is whether homosexuals are discriminated against. I think the case today is whether marriage is the proper term to define the union. Isn't that the matter at issue before us today? I don't know that the government is going to seriously argue the discrimination that homosexuals haven't been discriminated against. Do you? Yes, sir, I understand. Do you think they will? No, no, I agree with your honor. However, denying marriage is but another form of discrimination. Well, it depends on the definition of marriage, doesn't it? Well, yes. The definition the government has imposed. And does marriage include the ability to procreate? And homosexual people do procreate, your honor. Homosexual people, many of homosexual couples have children. Without the assistance of a third factor, third party? You mean same sex can produce a child? Well, in modern society, your honor, it's possible to go to a sperm bank. Oh, yes, but that's with outside assistance. I agree that. Yes, sir. One goes to the sperm bank or they get a substitute. There's some famous man who is a newspaper who was a substitute. But you've got to go outside of the two people, don't you? Yes, sir. Many people have natural children through natural processes and then enter into a homosexual marriage. Let's put it another way. Does procreation enter into the definition of marriage? Well, I agree with the Massachusetts Supreme Judicial Court that it does not. Well, if the Massachusetts Supreme Judicial Court thinks it does not, then your clients could go to Massachusetts and get married. Can they? No, they cannot. That's right. But if they were opposite sex, they could go to Massachusetts and get married. No, they cannot, your honor. Yes, they could. They just have to have a period of time. But they can satisfy that period of time. Yes, sir. If they were residents. Yes, sir. Yes, they can satisfy it. But same sex. Well, go ahead. You make your argument. I don't want to take you away from your argument. But I think marriage is a bundle of sticks, and a bundle of sticks includes procreation. And if it does, if it's not there, it's the salt brief. You read it, didn't you? Well, your honor, I agree with Justices Scalia, Thomas, and Rehnquist, who in their minority opinion in the Lawrence decision understood and stated that the Lawrence decision rendered the ban against same-gender marriage to be, and I believe their words were very much like a, to be on extremely thin ice. And it was approximately six months later that the Massachusetts Supreme Judicial Court ruled on Goodrich. I'll let you make your argument. The problem I've got, I'm so firmly opposed to discrimination, you can't even imagine it. But you've got to define it. And the way you define it, it they have that this class does not have? And then you get an answer. And you say, is that valid? Now, once upon a time, the answers, they had an answer, but, you know, they're not human. They're not this. They're not that. Those are not valid. But if it's valid, and if it's not offensive to the Constitution, then have you had discrimination? And that's a problem. You stretch the umbrella too wide, it doesn't cover anything. It's, you kill what you're trying to save. If you make everything that you don't like, discrimination. Well, we should stretch the umbrella to protect people that actually exist. Are discriminated against. Yes. Those doubt about it. And, and there's no doubt that homosexual people and their children are discriminated. There's no doubt about it either. But the union of sodium makes something, the union of chloride makes something, and the union of sodium and chloride makes salt. And that's what the government's going to tell us. That two people can certainly do it. They can unite. They can do everything. But you can't call it marriage because something vital and necessary is missing. And that seems to me what your brief doesn't answer. Now, maybe it does, does it? I believe it does, Your Honor. All right, go ahead. Procreation is not vital and necessary to marriage. Many married people do not procreate. By choice and by an absence of the ability. I understand that. The majority. But no, no same-sex people procreate. Well, together, you mean together they do not procreate. But in fact, they do have children. And we should not stigmatize those children. And it's not rational to stigmatize those children. We're not stigmatizing. We're just saying that they come out of a union that isn't marriage. And our society calls that illegitimate. And that is a stigma. And we should not stigmatize children. Anybody. Go ahead.  Nobody wants to stigmatize. That's one of the presumptions. Before we got to this point in the opposite-sex marriages, the presumption that the child was born of the union was to make sure the child was not illegitimate, even if the mother had had an affair outside. The father was presumed to be the father. But you'll never get that presumption to work with same-sex, I don't think. Can you? Well, I think that the Michael H. case, which is what Your Honor just referred to, is a case of distress, actually. I think the courts may not have had a very good history in the area of family law. I know Michael Hershenson. I've represented Michael Hershenson. And I can tell you that that case, which supported the marriage, wound up separating a father from his daughter. And so, again, it's a good example of why procreation is not the important element of marriage. Your Honor, I don't want to take you to use your time on that point. It's a point we're going to have to decide. Yes, sir. And I wanted you to clarify me, if you could. Yes, sir. I would ask you to consider that the majority of all children in our society live in single-parent families. So I think we have to look at marriage in real terms in our modern culture. It's not Ozzie and Harriet are gone. And we need to be realistic about how we view these children. And it is important. And it is the issue. It's part of the issue that children should not be stigmatized. And this bias against homosexual people stigmatizes many children. And homosexual people are real people who live in our society who are denied the very same rights that heterosexual couples have simply because of bias. It's simply a bias, in my view. I don't think anybody's going to seriously argue that you and I are right on that point. We're just talking about marriage. Does the union of two same-sex people constitute marriage? Isn't that the narrow question before us? Yes, sir. But if we simply come up with an arbitrary reason to say that we're not going to permit you to be married because you cannot procreate together. You can unite. You just won't be married. That's all. You can unite. You can do everything else you want to do. But you can't call it marriage. You cannot, sir. For example, the right not to testify against one's spouse, the right to file joint tax returns. Well, isn't that legislative? Every right you've got now, when you unite, is legislative, isn't it? Well, but the right of marriage and the rights that emanate from that is a fundamental right. The right for same-sex unions, legislative. I'm sorry? They're legislative. The legislature says, here's what you can do in a same-sex marriage. Isn't that right? Well, some legislatures... A same-sex union. A same-sex union. A same-sex union. Yes. The domestic partnership... So you just go in and say, add one more. Add one more. Well, the domestic partnership laws are a great insult to people, Your Honor. I mean, the simple test of that is to tell heterosexual couples, from now on, you won't be allowed to marry, but you can have the domestic partnership. Listen, I'm going to let you make your argument. The problem is I'm so opposed to discrimination that I want us not to say everything that's wrong is discrimination, because everything that's wrong is not discrimination. You've got to have a measuring rod, and then you've got to see a difference. And if the difference is valid and does not offend the Constitution, then it isn't discrimination. That's all. That's my point. But you don't worry about it, because three people are going to decide this case. Thank you, sir. So you go ahead. Let me get to a point I want to raise, which is the question of standing and mootness. Can you bring us up to date on what the current situation is with whether your clients have terminated their registered domestic partnership or not? Well, the answer is that my clients... The position of the State of California would be that it is terminated. My client's position is that it is not terminated. Did they file notices of termination? I'm sorry? Did they file notices of termination? Well, that's the argument. They... I just want to know the facts. I don't want to know the argument. What's the current status? And then you can tell me why it matters or doesn't matter. They sent documents in that were termination documents. They were filed. The document was filed, and the State of California has filed them. That's it. That's what the statute said is the way you get out of a domestic partnership. That's not exactly what happened, Your Honor. They sent in a conditional. They sent in a bunch of papers, yes. But they sent in the form, and they both signed it. Well, if I may just inform you, a Superior Court judge agreed with my argument, and in November we filed a writ in the Fourth District Court of Appeals on Spurgeon Street in San Juan. That is still under submission, and it's now April. And I'm sure Your Honors appreciate that I think that about 95% of writs are denied within about 30 days, and I can't predict what they'll do, but I checked as recently as last week, and there's no ruling, and I think there's a lot of reason to believe and be hopeful that they're not going to permit the State to simply do what they have done. But what they've done, they filed the notice document that you sent in. I understand the page question. They have filed the document that's designed to eliminate the domestic partnership, correct? That's not the one. No, sir. I appreciate it, but that's not correct. They said, I have a condition. What are these documents that were filed? It was a demand to recognize their marriage. Yes. It says right on it. The cover of the face document says that they're deregistering. Does it not? It does not. Well, it's misleading to just say that one sentence. It is not. That's part of what it says. Just part of the document says that. The face document, the document when filed, says that on its face, correct? That's part of what it says on its face. Yes, sir. All right. I don't mean to be difficult, but there is. No, that's fine. You're supposed to be difficult. It says the reason, and it says their marriage to each other. That's what they say their reason is. I understand their reason. With a demand that their marriage be recognized. I understand their demand, but the point is, they said, we don't need this. We're decertifying it. We're deregistering it because we're married, and we demand that you recognize that. Well, then they got a letter back saying it's unfiled, and the documents were returned. Yes. Unfiled. Then the law in California, if you file divorce papers at a court and the clerk mailed them back and said they're unfiled, the law is you're married. Now, the papers say we're filing for divorce, but you're married under California law. If you get a lot, if you have a good faith, let's let's let's go back a little bit. Let's assume that, in fact, the registered domestic partnership has been terminated. Assuming hypothetically, what does that do to your argument in the defense of marriage? I have it's beyond me why the issues are even related. I don't know. Well, I think it's because if if they've terminated their domestic partnership and you're claiming that it means something more than the case, then you've lost your standing because the standing was predicated on the legitimacy of the domestic partnership, registered domestic partnership. Well, if if you if you agree that that's what standing is predicated on. Well, that's what the district court predicated on. He said you have standing because you are registered domestic partnership. So you can you can he permitted your challenge to Section three. I don't believe I ever made that argument, sir. I'm reading just the district court opinion. I'm sorry. I know what I know, which the district court didn't make yet standing on on the second provision. And then setting granted you're standing on the third because because of the status of registered. So you just what you don't want to address that point? Well, I just I just want the court to know that you might want to see what the what this report of appeals does, if that's going to be dispositive to your ruling, because your argument, I think, is that it doesn't matter if they have that or not. It doesn't matter what the district court said about standing. They have standing with or without that. Isn't that right? Yes, sir. But that's your argument. What if we were in a state that didn't have a domestic? What if something isn't that your argument? Yes, sir. So why should we abstain at this point? Why shouldn't the district court abstain and let the California courts sort all this out before we even get to your federal? Well, because I don't think that's I think the standing is a red herring issue. It's a it's it's really quite irrelevant to the issue. It wouldn't matter whether they were domestic partners or not. Well, I mean, if under your argument, that's true. But if we don't credit your argument, if we adopt the district court's logic, then it does make a difference. Well, I don't know what the protocol would be, but our our trial judge retired shortly after rendering the decision. So I don't know how the protocol would work in remanding the issue. I. Well, let me ask a broader question, just in terms of abstention. And I've read I've read your arguments on abstention. Here we have a question of state law that the state of California is sorting out now all the way through. And it will be the Supreme Court of California will issue a decision. We have another a lot of other ancillary questions about it, but they all seem to me to be a predicate issues before we get to any of the federal issues. Because if the state if you win or if the plaintiffs on those other suits will win, then you have perhaps a state sanctioned marriage in California, which changes your federal argument considerably. No, sir, it doesn't. Why do you disagree? Because they're using the word marriage, but it's not the same marriage as a heterosexual couple has. It's a second class marriage. There's no you can't. How do we know that until the state courts finish with it? Well, you can't file a joint tax return under the state cases. You can't. That will not give you that right. You can't. If you go to the lobby, are you talking about today or if the California Supreme Court says California must. Issue marriage licenses and treat same sex couples the same way as it treats married people. If the California Supreme Court says that's what the California Constitution requires, then indeed, in California, at least, you can do all those things. May not be able to do it someplace else, but you do it in California. Correct. Well, no, I don't. California in all California governmental issues. Well, OK. But that's not filing a joint tax return with the federal government. And I, of course, I agree with in California that you would have certain similar rights to a heterosexual couple, but less rights. All the California rights. Everything California could do. You'd have. Is that not true? Everything for you. I think it's I think it's somewhat unclear, but we don't know if that's true or not. But I don't know until California rules. Correct. Well, if California, if hypothetically such a couple were to get married and then go to Arizona and commit commit a crime, that's in part committed in California. And I mean, we could go on with hypotheticals and we wonder if if then there would be a privilege not to testify against one spouse. And I think that's all unclear in the law as to what whether or not it would be the same. We don't know the answers to those questions. Why do your clients have standing to raise any of those questions right now? I mean, you talk about the right not to testify and that you've listed all the federal programs, but the record doesn't indicate that that your clients have applied for any of those benefits and then denied. My clients applied for a marriage license in the state of California. I'm talking about federal benefits. You've listed all the federal benefits that accrue some. But for example, obviously, the provisions of the Surface Mining Act aren't don't apply to your clients. You can't claim any injury based on the application of the Surface Mining Act provisions or the immigration provisions or a whole host of those things that you've listed, the agricultural. I mean, you've listed all these thousands of things, but your clients have not alleged one that they've been they've applied for and been denied. Right. Federally, I'm not I'm sorry, I'm having some difficulty with it. I'm at 26 seconds. If you grant the relief that we're requesting, which is to strike down DOMA and then they would have all those rights. No, they would not because they don't apply to your clients. You haven't applied. So you don't know. There's a case of Madison versus Boise State, which says you got to apply for the rights and be denied to have standing to to assert that you have those rights. I know you're making a broad argument, but it's when you talk about standing and particularized in particularized injury. I feel it's it's difficult for me to see that in the record of this case as to your federal claims. So anyway, thanks for your time. We took up your time with your question. Thank you. Judge Thomas may have placed the court on Gregory Katz's for the federal government, speaking in defense of the constitutionality of the Federal Defense of Marriage Act. Every court to have considered the issue has held that the traditional definition of marriage as a union of one man and one woman does not violate the United States Constitution. That this court should do the same here. That unanimity of precedent is not surprising because the first case that we know of to consider the question whether the traditional definition of marriage violates the United States Constitution was Baker versus Nelson. And in Baker versus Nelson, the Supreme Court of the United States issued a binding merits disposition, rejecting both due process and equal protection challenges to the traditional definition as reflected in Minnesota law. The only arguable differences between... Is that the first case? I'm sorry? Is that the first case? I'm not sure. It's the first case that we know of, and it's the first case discussed in all of the briefs. I thought Reynolds discussed marriage and those sorts of things. Reynolds certainly did and held that traditional restrictions against polygamy are constitutional. But with respect to the question of same-sex marriage, the first case we know of is Baker. But as I said... Baker just said there wasn't a federal question involved. It wasn't a substantial federal question, and it's clear from the Mandel case and Hicks and the other cases in our brief that that counts, Judge Thomas, as a merits disposition. I'm not saying it doesn't count as a merits disposition, but it's hard to apply it against the challenges to the Defense of Marriage Act, which is federal. Well, I think that then... Huckney said there's no substantial federal question as to a federal law. Because what... We have a holding from the Supreme Court that it does not violate the 14th Amendment for the state to apply a traditional definition, both with respect to the licensing function under state law, who can marry, and with respect to the benefits question under state law, who can get the state law benefits that flow from being married. Then the question is, is there any constitutionally significant difference between this case, which involves federal benefits, and the Baker situation, which involves state licensing? We can only think of two arguable distinctions, and neither one has any weight. One is to say that, well, the state cases involve the 14th Amendment, due process and equal protection principles, and federal cases, of course, involve Fifth Amendment due process and equal protection principles. That's not a distinction that makes a difference, because, as this Court and the Supreme Court have held, the Fifth Amendment and the 14th Amendment are coextensive in the extent to which they do or do not restrict federal and state action, respectively. The second possible... It's putting a lot of weight on Baker that I'm not sure Baker can hold. It's not entirely Baker, Judge Thomas. It's reading Baker for the proposition that the 14th Amendment wouldn't prohibit a state from adopting a traditional definition, and then it is applying high-tech gaze, citing back to Weinberger decision footnote 2 of the Supreme Court, going all the way back to Bolling v. Sharp on the coextensiveness of the Fifth and 14th Amendment. But the coextensiveness doesn't come from Baker. It comes from an independent line of due process. At least at one time, the states had more flexibility than the federal government, though, did they not? They might have, but that hasn't been the rule, at least since Bolling v. Sharp. It has been the law that if the 14th Amendment does or doesn't constrain state action, then the Fifth Amendment applies comparably to federal action. The second possible distinction between this case and Baker is that Baker involved both a licensing function and a benefits function, and the Supreme Court said that's constitutional for the state both to deny benefits and to prohibit entirely same-sex couples from marrying. Of course, the Federal Defense of Marriage Act doesn't do that at all. The federal government doesn't undertake to marry people. It simply undertakes to allocate certain benefits based on whether or not people are married. If it is constitutional for a state both to deny all benefits that flow from being married and to affirmatively prohibit a same-sex couple from marrying, then we think the federal case, which involves a benefits function but not a licensing function, is a fortiori. For all of those reasons, we think that Baker, plus the further reasoning that I've set out, does foreclose the due process and equal protection claims asserted here by the plaintiffs. If you go beyond Baker, the next case you come to in our hierarchy of precedent is Adams v. Howard and the decision from this court, which is relevant in two distinct respects. One is that in footnote 2, this court specifically said that Baker was a decision on the merits entitled to binding effect on the issues necessarily resolved. Secondly, Adams went on to apply rational basis review with respect to marital benefits under federal law in the immigration context. The court specifically held that there was a rational basis for the federal government to allocate benefits based on traditional marital status, one man, one woman, precisely because it is only the unions of one man and one woman that can produce children. That is the same rationale that Congress asserted when it enacted the Defense of Marriage Act, and it is also the same rationale that we assert here in defense of the federal statute. If you had to succinctly state the issue that we are asked to decide, how would you do it? With respect to the federal government, I would say the question is whether either the due process clause of the Fifth Amendment or the equal protection principles in the Fifth Amendment prohibit the federal government from using a millennia-old definition of marriage in allocating federal benefits through the tax code or various other contexts. Which position on standing as to the federal claims? Although we are not usually in the business of advocating for broad standing rules, I think candor to the court compels us to conclude that we think there is standing for these plaintiffs to challenge Section 3 of DOMA, the Defense of Marriage provision. We don't think they are standing to challenge Section 2. The reason we think they are standing with respect to Section 3 is these plaintiffs, assuming they are no longer domestic partners, these plaintiffs would be similarly situated to plaintiffs in any other state which has no domestic partner arrangements. They seek federal marital benefits. They can obtain those benefits if they succeed on two claims. Number one, that the state licensing function with respect to marriage is unconstitutional to the extent it excludes same-sex couples. If they win on that claim, they can marry under state law. And then number two, with respect to federal law, the federal law limitation of marriage to opposite-sex couples is unconstitutional. If they succeed on both claims, then they can marry under state law and then get federal benefits under federal law. The plaintiffs in this case have asserted an intention to marry and to seek at least the tax benefit. I think you're right about a lot of the other benefits. If they succeed on all of those claims, they could get at least the tax benefits. If they file for them. That's true. And they haven't, right? That's true. I mean, is there anything in the record that indicates they filed for any federal benefit? No. I'm happy to continue with the Court's questions, but I don't want to eat into my coapolis time. Thank you. Thank you very much. Good morning, Your Honors. Christopher Krueger of the California Attorney General's Office, the California Department of Health Services and the State Registrar. From Washington State to New Jersey, state courts are dealing with the issue of same-sex marriage. The trial court, the district court in this case, properly abstained because all three requirements for pullman abstention were met. This is a sensitive issue of state social policy. A definitive ruling on whether the California Supreme Court could moot or alter the issues before this court. And the state law is uncertain as it's been reserved by the California Supreme Court in 2004, the constitutionality of the state statutes. I understand that's currently in the California Court of Appeal and fully briefed but not yet argued, is that right? Yes, it was fully briefed as of February 10th. We're waiting for an oral argument time. So the California courts on the first issue, there's no question this is a sensitive issue. The California courts have been dealing with this since 2004 when the city of San Francisco began marrying same-sex couples. The California Supreme Court said that San Francisco County didn't have that authority but reserved the issue. Even if they hadn't said it, though, somebody would wonder whether a mayor can decree it, wouldn't they? Right. Well, they said a mayor could not decree it. And they left the issue for the trial courts as to whether the statutes were constitutional. There are now six cases that got up to the Court of Appeal, as Judge Fernandez noted. And, of course, state courts all over the country have been dealing with this issue. Domestic relations have been long recognized as a proper issue for the states. Right. Well, the California Court of Appeal will resolve those cases and then we'll see whether the California Supreme Court elects to take review of that, right? Yes. What is the state's position on whether or not this registered domestic partnership has been terminated or not? Or do you have a position? Well, you know, the clients I'm representing here today, the California Department of Health Services and the state registrar, actually have nothing to do with registering the domestic partnership. But our office does represent, in the other litigation, the Secretary of State. That's why I asked you broadly. It's the state of California. Do you have a position? It's terminated. And they went to Superior Court. And I don't know. Mr. Gilbert made some reference to the trial judge agreed with him. The trial judge denied his request to, you know, sort of, I guess you'd call it, unpropunk, make the. Reinstate the. Reinstate the domestic partnership. Termination. Yes. There has been. And it's not. It was referenced by Mr. Gilbert, so I'll mention it. He mentioned a California Court of Appeal writ that's not in the record before you. He did file one. It is sitting there. But there's been no decision. There's not even been any indication that the court even wants to take up that issue. Something puzzles me as a matter of California state law. I can't see it in the statute one way or the other. Maybe you just know the answer quickly. OK. They they dispute that they deregistered. Correct. Is there anything in the law that keeps them from filing a new registration? That's what they want to be. Not that I'm aware of. I believe they could they could send in another registration. So they didn't want to go through all this stuff that's going on. If they just if they really cared about being true registered domestic partner, they can just file again. Is that right? Yes. OK. That's what it looked like on the statute. But I just didn't know whether there's something unique that we weren't aware of. I believe it's like you could you could marry the same spouse and divorce that spouse and remarry. I mean, you know, change your mind. And the procedure is to file a notice of termination in order to terminate the registered status. Yes. And as they did it, the fact they also sent in some kind of protest letter with it is, you know, it was a clerical issue and the secretary's clerical employee filed it. It's not adjudicator of legitimacy. It's a it's a filing office. Right. Yes. It's it wasn't an administrative hearing. It was just a form. And so a definitive ruling by the California courts could could moot or alter the constitutional issues before this court. You know, the statutes still need to be construed. State law is uncertain as the Lockyer v. City and County of San Francisco, California Supreme Court decision from 2004, made clear that they were they were leaving this issue open. So all three requirements for for Pullman abstention were met. And unless the court has any questions, I'll submit. What would be your bottom line in this court's ruling from your from your perspective? I gather your bottom line would be that we should abstain. Yes. The court should abstain because all the all the conditions for abstention are met and await. It's a state in the trial court and it'll wait. I know Judge Taylor retired. Some other judge will pick it up if there's any case remaining after the California courts are done. Thank you very much. Good morning, Your Honors. Byron Babbion for Proposition 22, Legal Defense and Education Fund. May it please the court. I just want to address a couple of things, particularly things that Judge Ferris brought up. Your Honor, the Supreme Court has said repeatedly, as you were implying, that things that are different, in fact, are not required by the legislature to be required the same. And when we're considering same sex couples and opposite sex couples, Congress, as well as state governments, can look at the composition of that relationship and note differences and treat them differently under the law. So it is with marriage. Congress, as well as state governments, recognize that there is a potential for procreation with opposite sex couples that does not exist in same sex couples. All of the cases dealing with marriage and marriage statutes, almost every single one of them recognize that the fundamental state interest in marriage is to regulate procreation, that is responsible procreation, to put forward an incentive and encourage biological parents to raise their children. And that is the mechanism that the state uses to encourage parents to raise their biological children. How do you deal with artificial insemination and the modern methods? I mean, obviously, single people are procreating. The majority have a substantial number of single-parent families. You have artificial insemination in gay couples. I don't understand, really, the procreation argument, I would say. Well, they are surrogating, but they aren't procreating. And courts have addressed this, too. For example, Morrison v. Sadler. When they look at third-party participation in the birth of a child, as it were, sperm donor, surrogate mother, or even by adoption, before that can take place, it is the result of deliberate planning, extensive, deliberate choice and planning. One thing that those people will never experience is an unplanned pregnancy, which obviously sex couples routinely experience. And the state has an interest in encouraging them into the marriage relationship where they are legally bound to their children that are unplanned. So, for example, in Morrison v. Sadler. I mean, the state has an interest in promoting unplanned pregnancies? No. The state has an interest in having a mechanism to address that so that if they foster or promote marriage, if there is an unplanned pregnancy, the parents are legally in place, they're legally bound. I thought you just said, though, you were saying that a pregnancy between a gay couple isn't necessarily planned. Isn't that the future argument? It is planned. It is always planned among a same-sex couple. That's the point. It's always planned. What I said was they will never experience an unplanned pregnancy, as opposite-sex couples will. And what is the state interest in that? Well, the state's interest in marriage, it takes the place, if you will, of that deliberate planning that might occur with respect to a third-party intervention in childbirth. And that, as Judge Ferris says, it presumes paternity with the father. In other words, opposite-sex couples experience unplanned pregnancies all the time. The state has an interest in those biological parents raising those children. So the state holds out marriage and encourages people to marriage so that now they are legally bound to their children whether they plan for them or not. In Morrison v. Sadler, they recognize that as an important state interest. Every state in the union recognizes that a child that is born to parents that are married, there's a presumption of paternity. And the states have a compelling interest in that presumption. So that is the difference. One, same-sex couples don't implicate the state's interest because they don't procreate. And with respect to third-party participation in childbirth or acquiring children, that is a result of extensive and deliberate planning. You can see that unplanned pregnancies happen out of wedlock. What's that? Unplanned pregnancies happen out of wedlock. That's right. What's the state interest in? That's why the state has a strong interest in having people marry and to get married. You're right. And that's a real problem. When children are had outside of marriage, that ends up becoming a real problem for the state. I mean, there are all sorts of social implications of that, many of which are negative. And that's why the state needs more marriage and to encourage marriage between opposite-sex couples. Plainly, the interest that the state has in marriage is not implicated by same-sex couples. And it's not invidious discrimination. If that was invidious discrimination, it would be a conspiracy from the beginning of time. Because every major civilization, as far as we know historically, has always recognized marriage as between a man and a woman. And that is because all of those civilizations and societies need a mechanism to deal with the potential procreative effects of an opposite-sex couple. My questions have taken you over your time. Okay. Time has expired. Thank you. Who else wanted to? I'm not going to deny you a chance to. All right. Very good. The case is certainly submitted.
judges: Farris, Fernandez, Thomas